DiCosola, Mr. Goodman. May it please the court, your honors. My name is Leonard Goodman. I represent Mike DiCosola, and I represented him at both of his trials and on this appeal. Mr. DiCosola stands convicted of loan fraud and tax fraud at two separate trials. Our first claim of error on appeal is that the government's misconduct before the grand jury requires a new trial or at least a remand for disclosure of the key grand jury testimony of the case agent. The loan fraud charges in this case allege that Mr. DiCosola provided tax returns to the lending banks, knowing that those returns contained inflated income numbers, which then would qualify him for these loans. But these tax returns were prepared and signed by his accountant, John Cerami. Thus, Mr. DiCosola had a defense at trial. They weren't submitted in any way, were they? Pardon me? You said they were prepared and signed? Correct. Where'd they go from there? They were never submitted to the IRS, that's correct. This was not an airtight defense, there's no question. The government could have played it straight and still perhaps convinced a jury that Mr. DiCosola knew the numbers in those revised returns were too high and were not realistic. But rather than take the risk, the prosecutors coerced the accountant to present a false statement to the grand jury. This false statement is laid out on page 30 of the appellate brief. The accountant told the grand jury in a prepared statement that at some point Mr. DiCosola asked me to prepare hypothetical tax returns for him and his business so that Mr. DiCosola could see what the potential tax consequences would be if he started to earn more money. Mr. DiCosola, quote, gave me the numbers to use and the tax returns were prepared for Mr. DiCosola's benefit. I trial, the government used this false statement to impeach his credibility and in fact the prosecutor admitted before the district court that this was its strategy. It's clear from the record that this statement is, the grand jury testimony, is false. The evidence clearly shows that the returns were signed by Mr. Cerami and the income numbers were not made up, they were computed by Mr. Cerami. His methodology may have been incorrect, the numbers may be too high, but these are not hypothetical returns and they were not unsigned. What I find puzzling, you'd understand why you'd want your accountant to tell you what the tax consequences would be if you earned more money, that's fine. Why would they be in returns? Since they're not going to be filed, they're just to give the client, you know, a sense of how much more tax you'll have to pay. My understanding is that for this accountant, it was easier to spit them out as sample tax returns to show the consequences rather than calculate it on a piece of paper, but you're right, they don't have to be on tax returns. Is this common? I mean, do you know? I've never heard of this before. I don't know. This is the first time I've ever heard of an accountant preparing hypothetical tax returns. Well, what about the first time I've ever heard of an original issue discount? Yes, and I was going to get to that. I'm sorry, go ahead. Yes, I just want to stress that United States versus Heller, the case that we rely on on this issue, is an almost identical case. In that case, the defendant's accountant prepared tax returns using a disputed method of accounting. The government coerced the accountant to give false testimony, claiming that the defendant concealed facts from him during the preparation of the returns, and this tactic ruined the accountant's usefulness at the trial as in support of a reliance defense. The Eleventh Circuit concluded, quote, Mr. Heller has been deprived of an important defense witness by substantial interference on the part of the government, and they granted a new trial. The same result is alternatively, we would ask that the case be remanded so that we can have additional grand jury transcript. But he was called as a defense witness, wasn't he? Mr. Cerami was, and he was impeached with his false statement before the grand jury, describing them as hypothetical returns, and he was basically a useless defense witness. So the reliance defense was undermined by this tactic. Well, what is false? When his forced testimony was that his client misinformed him when, in fact, he knew darn well his client misinformed him. Isn't that what was forced out of him? What was forced out of him is to say that these were hypothetical returns, not prepared for use as filing, or maybe it's the other case you were referring to. The Heller case is an Eleventh Circuit case, which is almost identical facts. But that's when he was forced to testify? Yes, the same situation. He was forced to testify false. And then he testified that his client gave him wrong information. Correct. And in this case, he knew it was wrong. In this case, the same thing is said. Hypothetical, if you want to call it that. Well, Your Honor, the key thing is, a hypothetical return he would not have signed, because when a CPA signs the return, he's certifying that these are accurate numbers. I use general accounting principles. My client can rely on them for whatever purpose, whether it's filing with the IRS, or perhaps submitting in support of a loan. It doesn't make any difference? Once the CPA signs it, or the accountant signs it, it's good for anything? Well, I don't know, but certainly by signing it to the CPA... I mean, it seems like filing, it clearly would be for filing, but does it count if he gives it to a bank? I can't answer. You certainly could make an argument for returns that were not filed in support of a loan, but that's not the case the government made. I mean, the government could have played it straight and possibly won this case. There's no dispute. They didn't. They had Mr. Tcaso say something that was clearly false before the grand jury, and then discredited him at trial to make sure that the defendant's defense had no chance. If there's no other questions, I would like to move on to the tax case. The second claim of error is that the evidence was insufficient to sustain the We understand the high burden on insufficiency claims, but here we're not asking the court to find that any of the government's evidence was incredible. In fact, the evidence is undisputed here. All of it shows that Mr. Tcaso, who's an eccentric character, was a true believer in this theory. What we used to call tax protests. I mean, he exhibits all those. He goes to seminars, he reads books, he What the evidence shows here, and I would urge the court to look on pages on our briefing, I think in the page numbers, but we lay out all of the correspondence with the IRS, and it's very clear. I understand he corresponded. He's a true believer in this theory, as absurd as the theory is. I've sentenced true believers to, when I was a district judge, they were true believers, but. That's what happened here. The judge convicted him and sentenced him, and basically, you know, a very well-respected judge, and an experienced judge, basically set aside all of this evidence. I mean, we have, here you have a situation where we have all the seminar materials that he, which basically instruct him, you have a right to this money. This is your money. Here is how you go and get it. You know, all these people, you know, goes back, it said the 16th Amendment wasn't ratified. Yeah, but it doesn't say that there's, there's a certain type of citizenship where they aren't liable for anything. I don't remember what they are. Sovereign citizens. Yeah, sovereign, whatever, and now this one. I mean, this is the problem with true believers. There may be a problem with true believers, but this is not fraud. That's the point. If you believe it's true, it's not fraud, and this was not a sovereign citizen. The government makes, made that allegation in the brief. They did this. First of all, the return was so obviously false on its face, it was immediately flagged by the IRS as frivolous, within weeks. If he was committing fraud, he could have tried to cover his tracks and withdraw the return. In fact, the IRS told him, just withdraw your return, otherwise you're going to be fined and you're going to face criminal prosecution. Instead, what you have is five months of correspondence with the IRS, demanding some explanation, insisting that his theory was correct, demanding that they provide some explanation as to why it's frivolous. He sent copies of these letters, as the district judge found, to the Attorney General of the United States, to the Secretary of the Treasury. He put his fingerprint and his Social Security number on these correspondence. This is not the behavior of somebody that's trying to cover his tracks. There's no question that he was a true believer. I am, based on what you say, but true believers do go to prison. Well, but fraud is fraud, and this may be something else. He may have been, he may be guilty of something, but he's not guilty of fraud, if you truly believe it. The district court pretty much acknowledged that before and after the verdict, that the evidence did tend to show that he believed it, but the district court basically focused its verdict on the fact that the defendant, the theory was so absurd that no reasonable person could believe it. And I would submit that the case law does not support that as a justification for a fraud verdict. There are plenty of people, and we cite a case from, I think, the Ninth Circuit, but there's plenty of people that do get sucked in by these theories that appear to be preposterous, including reasonably intelligent people. If there's, this conviction cannot stand. If there's, if I have a minute, I would just like to mention the restitution issue, our last claim of error. As this court has held, there must be some evidence to support a restitution award. We're not attacking the entire award, but only the one to Amcor Bank. Here, with respect to that restitution, all we have is a statement by the prosecutor that said his case agent spoke on the phone to a person, quote, with knowledge at Amcor Bank, who said, according to our system, $560,000 is the total amount of loss. No documents were submitted, no testimony, no letters from the bank. This is not evidence, especially in a case where the bank seized more than a million dollars of Mr. DeCostela's assets against a $750,000 loan. You talking about an auction or something? Yes. It was all auctioned off, all of his business assets. Okay. If I may save a minute for... Sure. Thank you, Mr. Goodman. Ms. Greenwald? Morning, Your Honors. The government takes strong issue with the that the government presented false testimony intentionally to the grand jury for some purpose of setting up the defendant and being able to railroad him at trial. Mr. Cerami's testimony before the grand jury was that these were hypothetical returns, that he wouldn't have signed hypothetical returns, and the returns signed by him were all presented to the grand jury. It was all presented there. And his testimony was consistent pretty much at trial in the sense that he testified at trial, that he created these returns at the defendant's request based on documents provided by the defendant, all consistent with the grand jury. But at trial, every time Mr. Goodman led him with, on the amended return, on the amended return, and we cite to that in our brief, he just went along with it and amended returns. In fact, the one time he was asked an open-ended question with reference, and again we cite this at length at our brief, and... Open-ended meaning not leading? Non-leading, thank you. The one time he's asked, look at Exhibit 20. What is Exhibit 20? The witness said, well, if I had to say, I'd say it was a hypothetical return. And then Mr. Goodman redirected him, well, you signed it, meaning then you were committed to it, and he said, oh, then it the most you can say about this witness is exactly what Judge Leinan Weber said. We don't know what the truth is from this witness, but the judge who heard the witness, who is at the trial, totally rejected at the October 1st, 2014 proceeding, any suggestion that the government presented false testimony. As he said, the jury found that his testimony in the grand jury must have been true, because they didn't buy this defense. And as the court found, this witness, at the best you can say for him, was inconsistent, but you certainly couldn't say that the government intentionally presented false testimony. Much less that the government... I mean, the government really does take issue, because there's nothing in this record to suggest that we intentionally presented false evidence, or that we did so by coercing the witness, which is something that happened in the Heller case. Equating the facts here to the case, it becomes irresponsible in many ways. Because here, what you have is that the evidence in this case, and the interviews are all in this case. With the hypothetical returns, click and... Excuse me, Judge, I don't... What is the relevance of the hypothetical returns? So I think that based on the interviews that the government had, and the grand jury statement that the witness gave, and repeatedly asserted is true in the grand jury, what the witness said was, this guy came, I was his accountant, he came to me at one point, and said, and gave me numbers to kind of compute on a return, what my tax would be like. And those are hypothetical returns, not the intent that they would be filed, but I call them hypothetical returns. And that's what I prepared. But, he said, I wouldn't have signed hypothetical returns. So what we did, in honest disclosure to the grand jury, was we put in what the witness told us, that's what he said, and we put in the returns. All of those returns. And I would direct the court to, I believe I have this site here, and I will get it for you, it's definitely cited in our brief. Here, R-230-6, R-230-7, and R-230-8. We put in his, before the grand jury, was his grand jury statement, and all of the returns at issue, as an attachment to his. So it's all presented, what he told us during these interviews. So he testified that he testified inconsistently with himself. He testified, these returns are hypothetical returns, but I wouldn't have signed them. So what the government did is we had a witness, a witness who prepared these returns that the defendant had submitted falsely and fraudulently to the banks. And so we put him before the grand jury, and he said what he said. And those show that he did sign them. And they show that they did. And we didn't, if we were trying to be tricky here, we wouldn't have put in the returns. We put in the returns, we put in the witness, and it's the government's position that that was the more truthful testimony, and I'll tell you why. Because the returns, when he testified at trial, that, and again, it was the defense lawyer's words, but when he testified these were amended returns to be filed, the fact was, and he admitted this on his testimony, they weren't 1040s that are amended returns or supposed to be done on a 1040X form. That's the only way the IRS or anybody you file it for would know these are amended returns and not the original return. Business returns that are amended returns, there's a box on the return that you check when you're doing it as an amended return. This box wasn't checked on these returns, and he admitted in his testimony, and we called another accountant to testify, that should have been done if these were going to be filed as amended returns. And finally, if you're going to redo a return and recalculate, as he testified on direct to trial, the way you go about doing depreciation and doing all this to what we would say inflate income, there's a special form you have to fill out to do that. Not done here. And he admitted all that, and he admitted those were all things that you were supposed to do if you were going to file the IRS. He was lying at trial to the extent he was saying he was preparing these to actually file them for the IRS. What were they used for? Pardon me? What were these hypothetical forms used to do? So the defendant gets them, and what because the defense, because the accountant says I just gave them to the defendant, and what he did with them, they thereby inflated his income. And he then took those, and he submitted to Amcor Bank and Citibank, and so that he could get these loans. Because he knew his income, which included some years a negative income, and like some years 4,000, now he could report over 300,000. So that's the fraud upon the bank, and that's where the money comes up, and that's where there's a restitution number comes in. Later on, yes, there's the fraud on banks. So that's what he does with them. But you know, the main thing I want to really communicate to the court here is there is no basis in the record, no finding. In fact, a finding I would argue to the contrary by the court on October, at that proceeding on October 14th, that the government intentionally coerced a witness to present false testimony in the grand jury. There's nothing to support that here at all. And so basically what you have is a witness who testified differently at trial, and the jury decided that they did not believe that defense, and convicted the defendant. Nor, but even if, even if, and again, I would like to even say this because I think the allegation is so not supported, but even if we did present false testimony to the grand jury, the defendant has to show that there's a grave doubt that the decision to indict was free from the substantial influence of that testimony. And here, you know that was not the case because our case-in-chief did not rely on any testimony from Cerami. It relied on the fact that he submitted these false documents to the banks. That was our case. That was sufficient to bring this indictment in the grand jury. But even more, even further, even if you don't agree with that, in Vincent, and Morgan, and Philpott, all cases we've cited to this court, this court has held, and the law is absolutely clear, that once the petit jury, his trial jury, convicted him, any error in the grand jury, including the knowing use of false grand jury testimony, is harmless. Maybe the only problem, when you, he testified that he didn't sign them, but when you submitted the return showing he did, did you say anything, was there any information provided to pointing that out to the grand jury? That I don't know. I mean, in, not in his testimony. Not in his testimony. Not in his testimony. So it just is, here's the documents, and here's the thing. But as I would also say, Your Government represented to the court, was that they put in the case agent, and the case agent summarized all this evidence that basically came in at trial. Which included, which included, that the tax returns he filed with the IRS, for his personal, were substantially, some of them showed negative gross income, different than the ones filed. And he never filed his business ones. But the business ones that were prepared by his accountant, that he never filed, showed substantially less. Moving on, because I'm almost out of time, but on the sufficiency of the evidence, I would just say at this point, that basically the defendant's re-arguing his case. The district court judge, it was a bench trial for this, he specifically considered expressly, both in his first ruling, and also when he denied the motion for judgment of acquittal, post trial. He specifically said, I know there's all this evidence that you say shows, that he truly believed this, and did not intend to defraud. However, I, he even speculated, you know, the defendant may have done all this to create this kind of defense. And basically, at the end of the day, what I'm looking at is all the circumstantial evidence, that he had motive, that the theory was absurd, and this was a businessman, who ran, and started, and ran a successful business for a substantial period of years. Who negotiated his own business loans, and mortgages, and who to do this, he said, just on, based on the very documents he had to create, because he had to create those IA, OID forms, and on the face of them, they're clearly supposed to be prepared by the financial institution. Well, there are plenty of people who are purportedly intelligent business people, or other professionals, who get convicted of the same thing. Absolutely, but I would say here, that even if he was a true believer, Your Honor, even if he was, the fact was here, here he knew. He, you know, you can believe something, and you can want it to be so, but you can also know that you're, that you're trying to get something you're not entitled to. But in any event, that's what the court found, and whether he'd be true believer or not, it found, it found that it met the statute, the elements, and viewed in the light most favorable to the verdict, it And finally, on the restitution, it wasn't just some nebulous information here in the PSR. The FBI agent identified that he interviewed a vice president of the bank, who reported what their loss was. He, the probation officer, went so far to interview the auctioneer. The defendant never said, well, and the called any witnesses, asked for, you know, access to a witness, never introduced anything to, not another version of the story. You know, I talked to this witness and they say something different. Never asked us to make him available so he could talk to him to find out if he makes something, said something different. There was no issue in contention, and what the law is clear on is, is the evident information in the PSR is sufficiently reliable, which the every indication there was, then that's sufficient, and then the burden shifts on the defendant to make an issue in controversy, and that never happened here. It was just, you need an affidavit or you need documents. There's no law to support that, and we cite cases in the, in our brief that show that interviews of witnesses can be sufficient. So there apparently was no, whatever you want to call it, effort to make the, whoever did the auctioning, was, it was, we'll call fair market sale, as opposed to just something that they took whatever they could get. Usually when they have, when you forfeit something or they take it over, then there's a question, did they get the most money they could out of the auction? Right, and I think, you know, if you read what this person's saying, their position is that they did, given the quality of the merchandise that was there, and that's kind of consistent with the evidence in the case, in the sense that this was a CD business, right, and it did make specialized CDs in special shapes, you know, as like promotional items. So you could see how that would be kind of specialized and maybe difficult to sell to a lot of things. And so, but there's not really a lot of information on that, but just the bare fact of, and that wasn't their contention. Their argument wasn't over that, over whether, in fact, this showed that the bank was able to recover only $140,000 between, because the actual, the loans were, for the business loans, totaled about $700,000, and the court held him accountable for restitution for, I believe, about $560,000. Okay, thank you. So unless you have any other questions, the government will respectfully request that you affirm the conviction in this case. I'd like to just address the one point on the grand jury. The Supreme Court, in the case United States v. Mekinick, which we cite on page 37 of our brief, said that a defendant may be entitled to grand jury transcripts upon a showing of particularized proof of irregularities in the grand jury process. I would submit that, at very least, we have satisfied that burden. I believe it was Judge Kaney that asked the critical question. If the grand jury was told that these were hypothetical unsigned returns that I made for the defendant, not for use in any, to submit to anyone, and then they were also given the returns which show that he did sign them, what was explained to the grand jurors about this inconsistency? Were they told that the defendant forged his signature? Were they told that, in fact, these were legitimate returns, that the defendants have some clue? Because if you look at page 32 of our brief, it cites, it sets forth what the, what the government, what the prosecutor told the district judge. The government said to the district judge, in, in the motion to dismiss hearing, the government said, the only reason we called this witness Cerami was not to support the probable cause finding, but to provide impeachment at trial. Then the government says that the, the probable cause in front of the case agent. But you were refused a transcript. We were never given the transcript of the case agent, which would explain all of these mysteries about what the grand jury was told. And in fact. You didn't get the case agent's testimony, transcript of his testimony before the grand jury. We did not. You did get. Cerami's. We got the accountant's. That was it. The only testimony that we got. And what the government told, what the government said about the case agent, is it said that the case agent supported the fact that he had two sets of returns, one which he provided to the IRS and one which he doctored and provided to the victim banks. What does that mean? Doctored suggests that he either forged a signature or he doctored the numbers on that return. Both of these we know are not true. As the government concedes, the defendant didn't forge his, his, his accountant's signature and he didn't change the numbers on the return. These were the returns that were prepared by the accountant. And as the accountant explained at trial, he explained the business costs and, and looked at the gross sales and came up with a higher income number and told the defendant that these were legitimate and I use proper accounting standards. We need those grand jury transcripts to answer these questions and at least we're entitled to that. Thank you. Okay. Thank you, Mr Goodman and Mr Greenwald.